**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

                                                                **13-CR-257S**

                    **-v-**

**HAYWARD TARVER, III,**
                              **Defendant.**
_____

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. William M. Skretny,

in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report

on dispositive motions. Dkt. #2.

## PRELIMINARY STATEMENT

        The defendant, Hayward Tarver, III ("the defendant"), is charged in a

Superseding Indictment, along with co-defendant Michael Early, with having violated

Title 21 U.S.C.  §§ 841(a)(1), 844(a), 856(a)(1) and Title 18 U.S.C. §§ 922(g)(1),

924(c)(1) and 2. Dkt. #10.  He has filed a motion wherein he seeks suppression of

evidence seized without a search warrant from premises located at 23 Littlefield Street,

Buffalo, New York on May 15, 2010.  An evidentiary hearing on the defendant's motion

was held by this Court on January 19 and March 14, 2016 and transcripts of those

proceedings were filed on April 27, 2016 as Dkt. #s 37 and 38 respectively.  At the

evidentiary hearing, the government called Buffalo Police Department ("BPD") Officers

Whitenight, Acquino, Pitts and Hamilton as witnesses.  The defendant called Mishawn

Montgomery as a witness but did not testify on his own behalf.  Post-hearing

memoranda were filed by the defendant  (Dkt. #45) and the government (Dkt. #46) on

June 16 and 17, 2016 respectively.  The matter was then taken under advisement by

this Court.

## FACTS[1]

Officers Bradford Pitts and Aaron Smith of the BPD were on police patrol

on May 15, 2010, and while driving down Littlefield Street in the City of Buffalo, a "young

lady [standing] in the middle of the street flagged [them] down."  T1, p. 45.  She told the

officers that she had been assaulted by a young lady who was inside 23 Littlefield.  T1,

p. 45.  The officers went to the front door of 23 Littlefield and Officer Smith knocked on

the front door but no one answered.  As a result, the officers transported this "assault"

victim to D District police station so she could discuss the matter with detectives there.

T1, pp. 48-49.  While the officers were at the station house, "intel" advised them "that

there may be a possible guy that was wanted in regards to a shooting some time

before, and also the suspect was still inside from the assault (sic); and that there may

be other people inside that house that have some type of affiliation to drugs and guns."

T1, p. 49.  Police Officer Mitch Thomas advised Officer Pitts that he, Pitts, "should have

some type of backup if he was going back to 23 Littlefield because the people in the

house were dangerous."  T1, p. 51.  Officer Pitts "rounded up a couple of officers at C

District to assist [him] in going [to 23 Littlefield] not only to find [this assault] suspect, but

---

[1] The facts are taken from the transcripts of the evidentiary hearing conducted on January 19 and March 14, 2016 and references to same are designated as T1 (January 19) and T2 (March 14) followed by the appropriate page number(s).

also the person who was wanted for the shooting." T1, p. 51. These additional police officers were Whitenight, Acquino, Hamilton, Bierl and Aaron Smith. T1, p. 52. Officer Pitts advised these police officers that he was "looking for [the assault] suspect that was in the house, along with a person that was wanted for a shooting; and [that] there also may be some other dangerous people in the house." T1, p. 52. The shooting suspect's name was Renee Edwards and it was believed there was an outstanding warrant for him. T1, pp. 87, 114.

When the officers arrived at 23 Littlefield, Officer Smith knocked on the door and the "assault" suspect answered by opening the door. This female was escorted to a police car by Officer Smith and she was placed under arrest. T1, p. 54.

The defendant had also come to the front door of 23 Littlefield after Officer Smith had knocked on it. T1, pp. 54-55. The defendant was "calm and cool" and walked out of the residence and "spoke with Officer Whitenight" while standing in the curtilage area of 23 Littlefield. No entry was made into the premises at 23 Littlefield by any of the police officers at this time. T1, p. 10. Officer Whitenight explained the "situation" to the defendant by telling him "that [they] were looking for the female suspect" in the assault. T1, pp. 10-11. This female "came out" of the residence and was placed in a police patrol car. T1, pp. 11, 23. It was at "about this time" that Buffalo Police Officers Acquino, Hamilton and Bierl arrived at the scene and advised Officer Whitenight "that there was a suspect possibly at the location involved that was wanted

for questioning in a shooting" whose name was Renee Edwards for whom they believed

there was a warrant.  T1, pp. 11, 31, 32, 41-42.  Officers Acquino, Hamilton and Bierl

"went to the door [of 23 Littlefield]" while Officer Whitenight continued conversing with

the defendant.  T1, p. 12.  Officer Whitenight told the defendant that the officers were

now "looking for a shooting suspect" and "asked [the defendant] if it was OK if [they]

searched the house for that shooting suspect."  T1, p. 13.  The defendant responded

"yeah" to this request.  T1, pp. 13, 18, 33, 35.  The defendant gave this consent to

search to Officer Whitenight before any of the officers entered the house.  T1, pp. 41,

42.

    As Officer Smith was escorting the female assault suspect to a police car

and while Officer Whitenight was "standing on the front lawn with [the defendant],

Officer Acquino "walked up to the front porch to see if Renee Edwards [the alleged

shooter] was in the house."  T1, pp. 90, 116.  A female identified as "Leishia

Montgomery came to the door" and he asked her "about Renee Edwards."  T1, p. 91.

At this point in time, the daughter of Leishia Montgomery, Mishawn Montgomery, came

to the door."  T2, p. 24. Officer Acquino asked the women who lived there.  "Lieshia

stated to [him] that she was the renter."  T1, pp. 92-94, 109-110.  Officer Acquino then

"asked them for permission to come in [the house] and search for Renee Edwards" and

"they both said yes, you can come in."  T1, pp. 94-95, 151-152.  Officer Bierl was with

him during this conversation with Leishia and Mishawn Montgomery.  T1, p. 95.  After

receiving consent, Officer Acquino and Officer Hamilton entered the premises and

immediately smelled "a very strong odor of marijuana from inside the house."  Upon

Entry into the residence, Officer Acquino asked the females if there was "anybody else

in the house" and they responded "no."  T2, pp. 27-28.  Both officers heard "loud, almost

running back and forth upstairs."  T1, p. 96.  They could tell there was more than one

individual and that they were "going from the front of the house to the back of the

house."  T1, p. 96.  Officer Acquino asked both Montgomerys "who was smoking

marijuana" and was told "probably somebody upstairs."  T1, p. 97.  As the officers "got

closer towards the kitchen, [Acquino] could tell somebody was coming down the stairs"

and he saw "a head poke out from the stairs and that individual went walking back up

the stairs" whom he "ordered down the stairs" and "two black males came down the

stairs."  T1, p. 97.  These two males were identified and then "handed off to Officer

Hamilton" who "escorted them towards the front area."  T 1, p. 97.  They were not

arrested as this time.

Because the two Montgomery women had "lied about people being

upstairs" and their claim that they did not know Renee Edwards coupled with "the strong

odor of marijuana, [Officer Acquino] went upstairs to check to see if Renee Edwards

could possibly be up there."  T1, pp. 97-98, 116.  Officer Bierl accompanied Acquino

upstairs.  T1, p. 99.  Neither Leishia nor Mishawn Montgomery ever told the police

officers that they could not go upstairs after they had given the officers their consent to

enter the residence for purposes of searching it.  T1, pp. 99, 110

Officers Acquino and Bierl conducted a safety search of the upstairs area

and in doing so, Officer Acquino observed 'in plain view" a "Bushmasteer semi-

automatic assault rifle sitting (sic) on the bed with several loaded magazines."  T1, p. 100; *see* Government Exhibit 3.  At that point, Officer Acquino "radioed down to the other officers" with a directive that they were to "cuff" everyone in the house for safety purposes since those individuals "could possibly have a weapon on them."  T1, pp. 101-102, 139.  Officers Acquino and Bierl continued their safety search upstairs and discovered "crack cocaine in an open drawer, clear plastic bags and U.S. currency on a dresser.  Officer Hamilton, who joined in the upstairs search, found a 7.62 rifle and a .357 loaded weapon in a closet.  T1, pp. 102-103, 128, 140, 154; *see* Government Exhibit 16.  Upon finding these weapons and the crack cocaine, the officers contacted BPD narcotics officers and they responded to the scene along with a K9 "approximately an hour later; one of the responders being Detective Nieman who was briefed by the police officers on the scene.  T2, pp. 39-40.

Detective Nieman spoke to Mishawn Montgomery and asked her if 23 Littlefield was her residence and she replied that it was.  He then asked her if they could "search the house," and when she responded "yes," Detective Nieman asked a police officer to get a consent to search form.  T2, pp. 8, 40-41, 51.  A police officer retrieved a consent to search form and it was presented to Mishawn Montgomery for her signature and she signed the consent form authorizing the police to conduct a search of the premises at 23 Littlefield.  T1, p. 129, T2, p. 41; *see* Government Exhibit 9.  Mishawn Montgomery admitted the signature on the Consent to Search, Government Exhibit 9, is hers.  T2, pp. 59, 69.

As a result of the search of the premises at 23 Littlefield on May 15, 2010, a number of weapons and drug paraphernalia and drugs were found and seized.

## DISCUSSION AND ANALYSIS

### A.  The Issue of Defendant's Standing to Suppress Evidence Seized from 23 Littlefield, Buffalo, New York

The government argues that the defendant has failed to establish that he had a reasonable expectation of privacy in the residence located at 23 Littlefield, Buffalo, New York on May 15, 2010 when the premises were searched by law enforcement officers and therefore he lacks standing to contest that search.  Dkt. #46, p. 1.  The defendant has submitted an affidavit asserting the following in support of his claim that he had a reasonable expectation of privacy in the residence at 23 Littlefield, Buffalo, New York on May 15, 2010 and therefore has standing to contest the search of that residence on that date:

> 6.  The address of 123 (sic) Littlefield, Buffalo, New York was leased to my sister and was her permanent address at that time.  It was also the permanent address of my mother.
>
> 7.  I was a guest in the house almost daily.  I was a guest on the date in question and spent time there that day prior to the police activity.
>
> 8.  On the date in question I was a guest in the house and planned on being there for quite some time that day.
>
> 9.  I had access to the house by permission of my mother.

Dkt. #27, p. 2.

7

"The party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakos v. Illinois*, 349 U.S. 128, 131, n. 1 (1978); *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1981).  In order to establish a violation of his Fourth Amendment rights, the defendant must meet a twofold requirement, "first that [he has] exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'."  *Katz v. United States*, 389 U.S. 347, 361 (1967).

The defendant has failed to meet this burden.  The only evidence he has provided to support his claim of a violation of his Fourth Amendment rights by reason of the search of 23 Littlefield on May 15, 2010 is what is set forth above from his affidavit of November 13, 2015.  Dkt. #27, p. 2.  Mishawn Montgomery testified that she and her mother were the only ones who lived at 23 Littlefield in May of 2010 and that no one else had their belongings in that house.  T2, pp. 63-64.  She further testified that the defendant is her brother and that he was not "staying at [her] house on May 15, 2010" and that he did not keep "his private belongings there."  T2, pp. 64-65.

The defendant's allegations that he "was a guest in the house almost daily" and "on the date in question" when he "spent time there that day prior to the police activity" are not legally sufficient to establish a Fourth Amendment expectation of privacy in the premises.  Although "legitimate presence on the premises" may be relevant to "one's expectation of privacy," it "cannot be deemed controlling.  *Rakos,*

*supra* at 148.  As the United States Supreme Court expressly held, "one who is merely

present with the consent of the householder may not" claim the protection of the Fourth

Amendment.  *Minnesota v. Carter*, 525 U.S. 83, 89-90 (1998).


### B.   The issue of Oral Consent to Search the Premises

> In *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) the
> Court reaffirmed the principle that the search of property,
> without warrant and without probable cause, but with proper
> consent voluntarily given, is valid under the Fourth
> Amendment.

*U.S. v. Matlock*, 415 U.S. 164, 165-66 (1974).


This principle was reaffirmed by the United States Supreme Court in

*Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) wherein it stated:

> The Fourth Amendment generally prohibits the warrantless
> entry of a person's home, whether to make an arrest or to
> search for specific objects (citations omitted).  The prohibition
> does not apply, however, to situations in which voluntary
> consent has been obtained, either from the individual whose
> property is searched, *see Schneckloth v. Bustamonte*, 412
> U.S. 218, 36 L Ed.2d 854, 93 S.Ct. 2041 (1973), or from a
> third party who possesses common authority over the
> premises, *see United States v. Matlock, supra*, at 171, 39
> L.Ed.2d 242, 94 S.Ct. 988.

> The Court went on to state:

> As with other factual determinations bearing upon search and
> seizure, determination of consent to enter must "be judged
> against an objective standard: would the facts available to the
> officer at the moment. . . 'warrant a man of reasonable
> caution in the belief'" that the consenting party had authority
> over the premises? (citation omitted).  If not, then warrantless

entry without further inquiry is unlawful unless authority
actually existed.  But if so, the search is valid.  *Id.* at 188, 189.

The burden of establishing the validity of such "consents to search" is

upon the government.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *Bumper*

*v. North Carolina*, 391 U.S. 543, 548 (1968); *Florida v. Royer*, 460 U.S. 491, 497 (1983)

(plurality opinion).

In determining whether a consent to search is valid or not, the "totality of

the circumstances must indicate that it was voluntarily given."  *United States v. Davis*,

967 F.2d 84, 86 (2d Cir.), *cert. denied by Content v. United States*, 506 U.S. 928 (1992),

citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249 (1973); *United States v.*

*Isofia*, 370 F.3d 226, 231 (2d Cir. 2004); *United States v. London*, 148 Fed. Appx. 19,

22 (2d Cir. 2005).  Stated another way, a determination must be made as to whether,

under a totality of the circumstances, "the consent was a 'product of that individual's

free and unconstrained choice, rather than a mere acquiescence in a show of

authority.'" *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (internal citations

omitted).

In meeting its burden of establishing that a consent to search was validly

given, the government need only show by a preponderance of the evidence that the

consenting party freely and voluntarily gave her consent to search.  In this regard, the

credibility of the witnesses is a question for the judge who heard them.  *United States v.*

*Miley,* 513 F.2d 1191, 1201 (2d Cir.), *cert. denied*, 423 U.S. 842 (1975).

This Court observed the demeanor of all of the witnesses during their testimony in the evidentiary hearing.  Although Mishawn Montgomery testified that she never gave her permission to the police officers to search her residence at 23 Littlefield (T2, pp. 58-59), I find her testimony in this regard to be non-credible and believe it was given by her in an attempt to aid the defendant who is her brother.  (T1, pp. 64-65).  On the other hand, I find that Officers Acquino, Hamilton, Pitts and Whitenight were truthful in their testimony.  Officer Acquino testified that before any entry was made by police officers into the residence at 23 Littlefield on May 15, 2010, he had a conversation at the front door of the residence with Leishia Montgomery, the mother of the defendant and Mishawn Montgomery, the sister of the defendant, both women being the residents in 23 Littlefield and specifically asked their permission to enter the residence and conduct the search for Renee Edwards.  T1, pp. 92-95.  Both women responded "yes" to his request and told him he could "come in."  T1, pp. 94-95.  It was only after Officer Acquino received permission from Leishia and Mishawn Montgomery that Officers Acquino, Hamilton and Bierl entered the premises.  T1, p. 95.  As a result, I find that the police officers were lawfully in the premises at 23 Littlefield when then entered.

### C.  The Scope of the Consent to Search

The defendant argues that the police were only given a limited consent to search the premises at 23 Littlefield on May 15, 2010, *i.e.*, to search the premises for an

individual named Renee Edwards, and that they "exceed[ed] the scope of the initial

consent in their search of 23 Littlefield."  Dkt. #45, pp. 7-10.  As a result, he claims that

all of the evidence seized by the police in their search of 23 Littlefield on May 15, 2010

must be suppressed.  This claim of the defendant is rejected for two reasons.  As found

earlier, the defendant lacks standing to assert a Fourth Amendment claim relating to the

search of the premises at 23 Littlefield on May 10, 2010 and therefore his claim is

without legal merit.  As the Supreme of United States has expressly stated:

> The established principle is that suppression of the product
> of a Fourth Amendment violation can be successfully urged
> only by those whose rights were violated by the search itself,
> not by those who are aggrieved solely by the introduction of
> damaging evidence.  Co-conspirators and codefendants
> have been accorded no special standing.

*United States v. Padilla*, 508 U.S. 77, 81 (1993); *Alderman v. United States*, 394 U.S.

165, 171-72 (1969).

 

In essence, the defendant is attempting to assert vicariously what may be

considered the Constitutional rights of the Montgomerys which cannot be done legally.

> Fourth Amendment rights are personal rights which . . . may
> not be vicariously asserted.  A person who is aggrieved by
> an illegal search and seizure only through the introduction of
> damaging evidence secured by a search of a third person's
> premises or property has not had any of his Fourth
> Amendment rights infringed.  And since the exclusionary rule
> is an attempt to effectuate the guarantees of the Fourth
> Amendment, it is proper to permit only defendants whose

Fourth Amendment rights have been violated to benefit from
the rule's protections.

*Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (internal quotation, citations & footnote

omitted).

Secondly, for the reasons hereinafter stated, the issue relating to the

"scope of consent" by the Montgomerys is superseded by the factual events that

occurred after the police officers lawfully entered the premises.

### D.  Valid "Safety Sweep" by the Police After
### Entering the Premises at 23 Littlefield

Immediately upon their lawful entry into 23 Littlefield on May 15, 2010, the

police officers smelled "a very strong odor of marijuana from inside the house" and

Officer Acquino asked both Montgomerys if there was "anybody else in the house" to

which they responded "no."  T1, p. 96, T2, p. 26; T2, pp. 27-28.  However, both officers

heard "loud, almost running back and forth upstairs" from which they could tell that there

was more than one individual upstairs and that they were "going from the front of the

house to the back of the house."  T1, p. 96, T2, p. 28.  Officer Acquino asked the

Montgomerys "who was smoking marijuana" and they replied that it was "probably

somebody upstairs."  T1, p. 97.  T1, p. 97.

Because the two Montgomery women had "lied about people being

upstairs) T2, pp. 27-28) and the officers determined there was a strong odor of

13

marijuana in the house, it can be reasonably said that these officers found themselves in a place of potential danger which legally warranted a "safety sweep" or "protective sweep" of the premises because of possible criminal activity occurring within the premises.   The officers had legally entered the premises for purposes of searching for and arresting an individual known to them as Renee Edwards who was believed to have committed an assault.   Also, these officers had been pre-warned in a police briefing "that there may be a possible guy that was wanted in regards to a shooting some time before, and also the suspect [Renee Edwards] was still inside from the assault (sic); and that there may be other people inside that house that have some type of affiliation to drugs and guns" who were "dangerous."   T1, pp. 49, 51-52.   These facts and circumstances certainly created a reasonable inference of danger which justified a "protective sweep" of the premises at 23 Littlefield by the police officers on May 15, 2010.   As the United States Supreme Court has stated:

> In Terry and Long we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control, of a weapon that could unexpectedly and fatally be used against them.   In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.   The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.   A Terry or Long frisk occurs before a police-citizen confrontation has escalated to the point of arrest.   A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime.   Moreover, unlike an

encounter on the street or along a highway, an in home arrest puts the officer at the disadvantage of being on his adversary's "turf."  An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

\*   \*   \*

We are quite sure, however, that the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and while making, the arrest.  That interest is sufficient to outweigh the intrusion such procedures may entail.

\*   \*   \*

We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.

\*   \*   \*

We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.

\*   \*   \*

The type of search we authorize today . . . may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene.

\*   \*   \*

The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the arresting officer possesses a reasonable belief based on specific and articulable facts that the area to be swept

harbors an individual posing a danger to those on the arrest
scene.

*Maryland v. Buie*, 494 U.S. 325, 327, 333, 334, 335, 336, 337 (1990) (emphasis added).

See also: United States v. Hassock, 631 F3d. 79 (2d Cir.2011).

The Court of Appeals for the Second Circuit has expressly held that the "protective sweep doctrine" is not restricted to circumstances involving arrests wherein it is stated:

> At the core of Terry, Long and Buie is the common understanding that the Fourth Amendment's reasonableness requirement is sufficiently flexible to allow officers who have an objectively credible fear of danger to take basic precautions to protect themselves. Buie recognized that when officers are inside a home-ordinarily an enclosed, unfamiliar space-they are particularly vulnerable to surprise attacks. Id. at 333, 110 S.Ct. 1093. The Court's paramount concern in Buie was not why the officers were present in the home, but rather, why the officers might fear for their safety and what they could do to protect themselves. Buie 's logic therefore applies with equal force when officers are lawfully present in a home for purposes other than the in-home execution of an arrest warrant, at least where their presence may expose the officers to danger that is similar to, or greater than, that which they would face if they were carrying out an arrest warrant.
>
> *   *   *
>
>  We are, of course, keenly aware that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. U.S. Dist. Ct., 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). We note, however, that Buie 's progenitors, Terry and Long, did not concern searches stemming from arrests. See Terry, 392 U.S. at 24, 88 S.Ct. 1868; Long, 463 U.S. at

1049-50, 103 S.Ct. 3469. Moreover, Buie itself allowed for a protective sweep after an arrest had been completed. See Buie, 494 U.S. at 334-35, 110 S.Ct. 1093. These factors, along with Buie 's grounding in the Fourth Amendment's reasonableness standard, convince us that the fact of an arrest or an attempted arrest (with or without an arrest warrant) is not a necessary precondition to a lawful protective sweep. The restriction of the protective sweep doctrine only to circumstances involving arrests would jeopardize the safety of officers in contravention of the pragmatic concept of reasonableness embodied in the Fourth Amendment. Although, an "arrest may be highly relevant" to the determination of whether officers possess reasonable suspicion of danger, Gould, 364 F.3d at 584, the effectuation of an arrest, regardless of whether pursuant to a warrant, is not the sine qua non of a permissible protective sweep. See id. Accordingly, we hold that specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant.

*United States v. Miller*, 430 F.3d 93, 98-100 (2d Cir. 2005); s*ee also: United States v. Gandia*, 424 F.3d 255 (2d Cir. 2005); *United States v. Moran Vargas*, 376 F.3d 112 (2d Cir.2004).

### E. Application of the "Plain View" Exception to the Fourth Amendment

For the reasons previously stated, the police officers were legally in the premises at 23 Littlefield on May 15, 2010 and thereby permitted to conduct a "protective sweep" of the premises after so entering. While conducting the "protective sweep," the officers observed in "plain view" a "Bushmaster semi-automatic assault rifle sitting on the bed" along with "several loaded magazines" for the .223 Bushmaster" in an upstairs bedroom.  T1, pp. 100-101.  The officers also observed "crack cocaine in an

open drawer, clear plastic bags and U.S. currency on a dresser" and a "7.62 rifle in a closet."  T1, pp. 103, 128, 139-140, 154; *see* Government Exhibit 16.  As a precautionary measure, the officers could validly "look in closets and other spaces . . . from which an attack could be immediately launched."  *Maryland v. Buie, supra*.

The plain view exception to the Fourth Amendment warrant requirement "authorizes seizure of illegal or evidentiary items visible to a police officer whose access has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  *Illinois v. Andreas*, 463 U.S. 765, 771 (1983); *Harris v. United States*, 390 U.S. 234, 236 (1968).  In accordance with this exception, the warrantless seizure of an item is justified where: (1) the police have lawful access to the place from which the item can be plainly viewed; (2) the item seized is in fact in plain view at the time it is discovered; and (3) it is immediately apparent to the police at the time of discovery that the item constitutes evidence of, an instrumentality of, or fruit of, a crime.  *Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. Kiyuyung*, 171 F.3d 78 (2d Cir.1999). To *meet* the "immediately apparent" standard, police officers must have probable cause to believe that an object in plain view is contraband without conducting some further search of the object. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Based on testimony presented at the evidentiary hearing, I find that all of the requirements for applying the "plain view" exception to the seizure of the .223 Bushmaster semi-automatic assault rifle, the loaded magazines, the crack cocaine,

clear plastic bags, U.S. currency and the 7.62 rifle have been met and therefore find such seizure to be a lawful one and not in violation of the defendant's Fourth Amendment rights.  Officer Acquino admitted that the .357 handgun was in a "black bag" in a closet when he discovered it and that it was not in "plain view" when he seized it.  T1, pp. 130-131.  As a result, this weapon could not have been lawfully seized under the "plain view" exception.  However, as previously found, the defendant lacks standing to object to this seizure.  Also, as later discussed, this weapon would have been legally seized under the inevitable discovery doctrine.

### F.   The Written Consent to Search By Mishawn Montgomery

In addition to reiterating his position regarding the oral consent given by the Montgomerys to search 23 Littlefield on May 15, 2010, the defendant argues that the written consent to search signed by Mishawn Montgomery, Government Exhibit 9, was the product of coercion by the police by reason of their show of force or "authority" in that there were as least eight police officers and a K9 present on the premises when she was asked to sign the consent to search form.  Dkt. #45, p. 11.  The defendant goes so far as to assert that Mishawn Montgomery was "bullied" by the police officers "into providing [the written] consent."  Dkt. #45, p. 11, ¶ 69.

Even if it is assumed, *arguendo,* that Mishawn Montgomery signed the written consent to search form, Government Exhibit 9, as a result of the show of force or authority by the police and/or as the result of being "bullied" by the police, the defendant has no legal standing to validly claim that such conduct violated his Fourth Amendment

rights.   "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."   *Rakas v. Ilinois*, 439 U.S. 128, 133 (1978).   As previously stated above, the defendant did not have a reasonable expectation of privacy in the premises at 23 Littlefield on May 15, 2010.

After Officers Acquino and Hamilton found the weapons and drugs during their "protective sweep," detectives from the Narcotics Unit of the Buffalo Police and a K9 reported to the scene at 23 Littlefield at their request.   Detective Nieman spoke to Mishawn Montgomery and asked her if 23 Littlefield was her residence to which she responded that it was.   Detective Nieman then asked her if they could "search the house" and when she responded "yes," he requested that she sign a Consent to Search form authorizing the police to search the entire home at 23 Littlefield.   *See* Government Exhibit 9.   T2, pp. 8-9, 40-41, 51; T1, p. 129.   Mishawn Montgomery admitted that the signature on the Consent to Search, Government Exhibit 9, is hers but claims she signed it after she was arrested.   T2, pp. 59, 69.   Assuming, *arguendo*, that Mishawn Montgomery was under arrest at the time that she signed the Consent to Search form, that fact alone does not "demonstrate a coerced consent to search."   *United States v. Watson*, 423 U.S. 411, 424 (1976); *United States v. Garcia*, 56 F.3d 418, 423 (1995). Based on the testimony presented at the evidentiary hearing, I find that the government has met its burden by a preponderance of the evidence that Mishawn Montgomery voluntarily and freely consented to the search of her residence by signing the Consent to Search form.   Nor does the fact that there were eight police officers and a K9 present

when Mishawn Montgomery was asked to sign the consent form cause her consent to be coerced or invalid.  As the Second Circuit Court of appeals has stated:

> Aggravating circumstances such as the handcuffing of the consenting party, the presence of numerous police officers and the representation that they would remain at the place to be searched indefinitely and secure a search warrant if consent to search were not given, would not automatically cause the search to be invalid.

*United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995*)*.

Having observed the demeanor of Officers Acquino and Hamilton during their testimony in the evidentiary hearing, I find them to be credible witnesses and therefore accept their testimony relating to the execution of the Consent to Search form, Government Exhibit 9, by Mishawn Montgomery.  *See United States v. Miley*, 513 F.2d 1191, 1201 (2d Cir.); *cert. denied* 423 U.S. 842 (1975) (credibility of the witnesses is a question for the judge who heard them).

## G.  Application of the Inevitable Discovery Doctrine

As previously stated above, the discovery of a handgun in a black bag during the protective sweep by the police officers could not be considered as having been discovered in "plain view" and therefore it was not properly seized under that doctrine.  However, after the police officers obtained a valid written Consent to Search the entire house (Government Exhibit 9) they conducted a thorough search of the premises at 23 Littlefield which resulted in the finding of a number of weapons, drugs,

and drug paraphernalia.  T 1, p. 132.  Based on the testimony received in the evidentiary hearing, I have no doubt that this valid, thorough search would have inevitably resulted in the finding of the black bag containing a weapon that had been found previously by the officers during their protective sweep.

As the Court of Appeals for the Second Circuit has expressly held:

> Under the "inevitable discovery" doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation.  *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) (inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred" (emphasis in original) (internal quotation marks omitted)).  In essence, the inevitable discovery doctrine's application turns on a central question: Would the disputed evidence inevitably have been found through legal means "but for" the constitutional violation?  If the answer is "yes," the evidence seized will not be excluded.

*United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006).

> We have made clear, however, that "proof of inevitable discovery 'involves no speculative elements but focuses on *demonstrated historical facts capable of ready verification or impeachment*,'" United States v. Eng, 971 F.2d 854, 859 (2d Cir. 1992), quoting Nix, 467 U.S. at 444 n.5 (emphasis in Eng). The focus on demonstrated historical facts keeps speculation to a minimum, by requiring the "district court to determine, viewing affairs as they existed at the instant

before the unlawful search occurred, what *would have happened* had the unlawful search never occurred." Id. at 861 (emphasis in original). Evidence should not be admitted, therefore, unless a court "can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor."  Heath, 455 F.3d at 60; see also id. ("Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is *no doubt* that the police would have lawfully discovered the evidence later."), quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982) (emphasis in Heath); United States v. Roberts, 852 F.2d 671, 676 (2d Cir. 1988) (holding that the issuance of a subpoena may not "inevitably result[ ] in the discovery of . . . suppressed documents" because several contingencies may not have been resolved in the government's favor).

*United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013).


## CONCLUSION

Based on the foregoing, it is recommended that the defendant's motion to suppress the use of all of the evidence seized from 23 Littlefield, Buffalo, New York on May 15, 2010 be denied in all respects.


It is hereby **ORDERED** pursuant to 28 U.S.C § 636(b)(1) that:


This Report, Recommendation and Order be filed with the Clerk of Court.


**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statue, Fed.R.Crim.P. 58(g)(s) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**


DATED:      September 8, 2016
                Buffalo, New York


                                         *S/H. Kenneth Schroeder, Jr.*
                                         **H. KENNETH SCHROEDER, JR.**
                                         **United States Magistrate Judge**